

**FILED & ENTERED**

**DEC 19 2019**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** gonzalez **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:     Christina Marie Uzeta, Debtor | Case No.:   2:18-bk-10408-ER<br>Adv. No.:   2:18-ap-01103-ER |
| Basilio Torices and Roxanne Martinez,<br><br>                                            Plaintiffs<br><br>                v.<br><br>Christina Marie Uzeta,<br><br>                                            Defendant | **MEMORANDUM OF DECISION FINDING THAT PLAINTIFFS ARE NOT ENTITLED TO A JUDGMENT OF NON-DISCHARGEABILITY PURSUANT TO § 523(A)(6)**<br><br>**TRIAL:**<br><br>Date:      April 8, April 10, and June 25, 2019<br><br>Time:     9:00 a.m.<br><br>Location:  Ctrm. 1568<br>              Roybal Federal Building<br>              255 East Temple Street<br>              Los Angeles, CA 90012 |

## I. Introduction

In this dischargeability action, Plaintiffs Basilio Torices ("Torices") and Roxanne Martinez ("Martinez") (collectively, at times, the "Plaintiffs") allege that they were financially harmed when Defendant Christina Marie Uzeta ("Uzeta" or "Defendant") refused to transfer a liquor license into a mutually-owned corporation, unilaterally dissolved said corporation, and permitted corporate assets to be foreclosed upon. Torices and Martinez contend that the damages they allegedly sustained in connection with Uzeta's actions are non-dischargeable under 11 U.S.C. § 523(a)(6).

Trial was conducted on April 8, April 10, and June 25, 2019. The Court ordered Torices and Martinez to file a transcript of the trial proceedings by no later than August 9, 2019.[1] The parties filed closing briefs on October 15, 2019.[2] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[3] For the reasons set forth below, the Court finds that Torices and Martinez are not entitled to a judgment of non-dischargeability pursuant to § 523(a)(6).

In her pre-trial brief, Uzeta stated that in the event she prevailed at trial, she intended to seek a judgment for attorney's fees against Plaintiffs and their counsel, pursuant to § 523(d). The issue of Plaintiffs' liability under § 523(d), if any, shall be determined by way of motion. By no later than **January 31, 2020**, Uzeta shall file a motion explaining why Plaintiffs' position in this litigation was not substantially justified (the "§ 523(d) Motion"). The § 523(d) Motion shall also contain an itemization of the attorney's fees to which Uzeta asserts she is entitled. Plaintiffs' response to the § 523(d) Motion, if any, shall be submitted by no later than **March 2, 2020.** This matter shall stand submitted as of **March 2, 2020.** Unless otherwise ordered, no hearing will be scheduled on the § 523(d) Motion.

## II. Pretrial Proceedings

Uzeta filed a voluntary Chapter 7 petition on January 12, 2018 and received a discharge on June 4, 2018.[4] Her bankruptcy case was closed on July 5, 2018 and subsequently reopened on May 3, 2019.[5]

### A. The Complaint and Claims for Relief

On April 16, 2018, Torices and Martinez filed a *Complaint to Determine the Dischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and/or (a)(6)* [Adv. Doc. No. 1] (the "Complaint") against Uzeta. Torices and Martinez initially asserted claims under §§ 523(a)(2)(A), (a)(4) (for fraud or defalcation), and (a)(6). At the Pretrial Conference, the Court dismissed the § 523(a)(4) claim, holding that "[r]egardless of Defendant's role, Plaintiffs are not entitled to relief on their § 523(a)(4) claim, because a director of a California corporation lacks the fiduciary relationship necessary under § 523(a)(4)."[6] On April 4, 2019, the Court approved the parties' stipulation to dismiss the § 523(a)(2)(A) claim with prejudice.[7] As a result, only the § 523(a)(6) claim remains at issue.

---

[1] A transcript of the proceedings occurring on April 8, 2019, is available as Adv. Doc. No. 123 and is cited as "Tr. Apr. 8." A transcript of the proceedings occurring on April 10, 2019 is available as Adv. Doc. No. 124 and is cited as "Tr. Apr. 10." A transcript of the proceedings occurring on June 25, 2019 is available as Adv. Doc. No. 126 and is cited as "Tr. June 25."

[2] Adv. Doc. Nos. 129 (Defendant's closing brief) and 130 (Plaintiffs' closing brief).

[3] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§101–1532.

[4] Bankr. Doc. No. 21.

[5] Bankr. Doc. Nos. 23, 33.

[6] Final Ruling Issued in Connection with Pretrial Conference [Adv. Doc. No. 62] at 15–16.

[7] Adv. Doc. No. 105

**B. Attempts to Obtain Revocation of Uzeta's Discharge**

On February 12, 2019, the Court issued a ruling denying Plaintiffs' motion to revoke Uzeta's discharge. The Court held:

> Bankruptcy Rule 7001(4) provides that a proceeding to revoke a discharge is an adversary proceeding. As explained by the leading treatise:
>
>> Whether a discharge should be granted, or once granted whether it should be revoked, is likely to become the subject of contested litigation. Given the importance of the result to the participants, clause (4) of Rule 7001, with certain exceptions, requires that such litigation be brought in the form of an adversary proceeding subject to the rules of Part VII.
>
> 10 Collier on Bankruptcy ¶ 7001.05 (16th ed. 2018).
>
> Here, Plaintiffs seek revocation of Defendant's discharge by way of a motion brought within a separate § 523 action. Plaintiffs have failed to meet the procedural requirements of Bankruptcy Rule 7001(4). To seek revocation of Defendant's discharge, Plaintiffs are required to initiate a separate adversary complaint against Defendant. A motion filed within a pre-existing adversary proceeding is not adequate, because motions are litigated on an abbreviated timeframe without a meaningful opportunity to take discovery. The more formal procedures associated with a separate adversary proceeding are required to determine an issue of this significance. The Motion is DENIED. The denial is without prejudice to Plaintiffs' ability to file a § 727(d) complaint against the Defendant.

Final Ruling Denying Plaintiffs' Motion to Revoke Defendant's Discharge [Adv. Doc. No. 65-1] at 10–11.[8]

On March 18, 2019, Torices and Martinez filed a *Complaint to Vacate Defendant's Discharge Pursuant to Rule 7001 (11 U.S.C. § 727(d)(1))* (the "Section 727 Complaint"). On March 21, 2019, the Court ordered Plaintiffs to comply with LBR 5010 and Court Manual § 2.8(c) by obtaining an order reopening Uzeta's bankruptcy case prior to filing the Section 727 Complaint.[9] The Court stated that Plaintiffs could refile the Section 727 Complaint if they obtained an order reopening Uzeta's bankruptcy case.[10]

On March 27, 2019, the Court denied Plaintiffs' motion to consolidate the trial of this action with the trial on the Section 727 Complaint.[11] First, the Court held that Plaintiffs' failure to

---

[8] An order memorializing the Court's ruling was entered on February 25, 2019 [Adv. Doc. No. 72].
[9] *See* Order Requiring Plaintiffs to Obtain Order Reopening Debtor's Bankruptcy Case Prior to Filing Section 727(d)(1) Complaint [Bankr. Doc. No. 28].
[10] *Id.*
[11] *See* Memorandum of Decision Denying Plaintiffs' Motion to Consolidate Proceedings [Adv. Doc. No. 90] and Order Denying Plaintiffs' Motion to Consolidate Proceedings [Adv. Doc. No. 91].

obtain an order reopening Uzeta's bankruptcy case meant that the Section 727 Complaint was not properly before the Court.[12]  Second, the Court held that even if the Section 727 Complaint were properly before it, consolidation would not be appropriate, because the two complaints did not involve common issues of law or fact:

> The Section 523 Complaint focuses upon Defendant's alleged wrongdoing with respect to the Plaintiffs in connection with a restaurant venture, whereas the Section 727 Complaint focuses upon Defendant's alleged failure to comply with her disclosure obligations under the Bankruptcy Code—that is, Defendant's alleged wrongdoing with respect to all creditors.  *See Willms v. Sanderson*, 723 F.3d 1094, 1101 (9th Cir. 2013) ("A § 523 complaint focus[es] on the debtor's prior dealings with an objecting creditor, rather than on actions which necessarily affect the rights of all creditors").

Memorandum of Decision Denying Plaintiffs' Motion to Consolidate Proceedings [Adv. Doc. No. 90] at 4.

Third, the Court held that consolidation of the complaints would not necessarily prove more efficient.[13]  Finally, the Court held that the prejudice to Uzeta resulting from the delay caused by consolidation outweighed any possible efficiency gains.[14]

## C. Plaintiffs' Other Pretrial Motions

On February 25, 2019, the Court denied two Motions *in Limine* filed by Torices and Martinez, which sought to exclude documents produced by Uzeta, on the ground that such documents were served electronically rather than by U.S. mail.  The Court found that both motions were not supported by any evidence, in contravention of the requirements of LBR 9013-1(i).[15]  In addition, the Court found that Plaintiffs had failed to meet and confer with Uzeta prior to filing the motions, as required by LBR 7026-1(c)(2).[16]

On February 25, 2019, the Court denied Plaintiffs' motion for an order deeming certain of Uzeta's discovery responses to be deficient.  The Court found that the motion was untimely, and that Plaintiffs had failed to show good cause to modify the Scheduling Order's deadline for hearings on discovery motions.[17]

## D. Issues Raised by the Court Concerning Plaintiffs' Damages

At the Pretrial Conference, the Court advised the parties of its concerns regarding the amount of damages alleged:

---

[12] Memorandum of Decision Denying Motion to Consolidate Proceedings [Adv. Doc. No. 90] at 4.
[13] *Id.*
[14] *Id.*
[15] *See* Final Ruling Denying Motion *in Limine* as to Defendant's January 2019 E-mails [Adv. Doc. No. 66] at 11–13 and Final Ruling Denying Motion *in Limine* as to Defendant's December 2018 E-mails [Adv. Doc. No. 64] at 11–13.
[16] *Id.*
[17] *See* Final Ruling Denying Plaintiffs' Motion to Deem Defendant's Discovery Responses to Be Insufficient [Adv. Doc. No. 63] at 13–14.

>Although it is impossible to prejudge the outcome of trial, the Court finds it appropriate to emphasize that Plaintiffs face serious difficulties in establishing that they are entitled to the damages alleged. The Complaint alleges that Plaintiffs invested $4,999 in Redwood on December 7, 2016. The Complaint further alleges that Plaintiffs loaned Defendant $10,000 on December 20, 2016, and loaned Defendant an additional $3,900 on May 2, 2017. The sum of Plaintiffs' investment and loans to Defendant was $18,899.
>
>The Complaint does not allege the date upon which the Restaurant closed. A declaration filed by Defendant supporting her Opposition to Plaintiffs' *Motion for an Order Vacating Debtor's Discharge* states that the Restaurant closed in October 2017.
>
>Plaintiffs argue that they are entitled to damages of $160,000 in connection with Defendant's alleged wrongful retention of the Restaurant Equipment, damages of $80,000 in connection with Defendant's alleged wrongful failure to transfer the Liquor License to Redwood, and damages in excess of $4,000 in connection with Defendant's alleged wrongful retention of the Sales Equipment. The Court finds it difficult to see how Plaintiffs could plausibly be entitled to damages in excess of $240,000 based on a capital contribution of $4,999 and loans of $13,900. It appears to the Court that the alleged damages are inflated.

Final Ruling Issued in Connection with Pretrial Conference [Adv. Doc. No. 62] at 17.

## III. Evidentiary Issues at Trial

During the course of the three-day trial, the parties asserted numerous evidentiary objections against witness testimony and exhibit[18] evidence, which includes documents presented for the first time at trial. In the interest of equity, and when germane to material issues, the Court admitted some evidence untimely submitted. Where relevant to the findings and conclusions discussed below, specific reference will be made to the Court's many evidentiary rulings at trial.

## IV. Credibility Determinations

The testimony of Uzeta, Torices, and Martinez differed in material respects, as detailed below. In resolving disputed issues of fact, the Court finds that Uzeta's testimony was more credible than Torices'. Uzeta was a persuasive witness—her testimony was direct, clear, consistent, and she stayed on topic. Also, she did not contradict herself during cross-examination. By contrast, over the course of direct examination, Torices regularly meandered into extended, and often irrelevant, narratives. Often, Torices was unable to respond directly to counsels' questions, and his testimony was replete with vague and unfounded statements of limited probative value. Torices' testimony was frequently excluded as non-responsive, speculative, or irrelevant. On cross-examination, Torices conceded damaging facts and was unable to persuasively explain key portions of his direct testimony. It is especially detrimental to Torices' credibility that parts of his testimony were contradicted by physical evidence or the testimony of more credible witnesses.

---

[18] Exhibits submitted by Torices and Martinez are identified in numerical order; exhibits submitted by Uzeta are identified in alphabetical order.

Key examples illustrating Torices' lack of credibility are as follows. First, Torices accused Uzeta of sending Jason Kho ("Kho")[19] an e-mail instructing Kho to "shred all the paperwork" pertaining to a liquor license.[20] The alleged e-mail is not in evidence. Kho categorically denied shredding any documents upon any request by either Uzeta or Torices:

> **Question (by Uzeta's counsel):** Okay. Early on in this case, it's my recollection that Mr. Torices testified that he [sic] had asked you to shred some documents. Would that come as a surprise to you?[21]
> **Answer (by Kho):** Yes, I would never shred --
> **Question (by Uzeta's counsel):** Have you ever -- I'm sorry.
> **Answer (by Kho):** I would never shred documents, in particular escrow. That would be something the escrow company would handle if they were to do that.
> **Question (by Uzeta's counsel):** And in this particular case, you didn't shred any documents, did you?
> **Answer (by Kho):** No.

The Court regards Kho as a highly credible witness, who possessed a relatively low stake in this dispute and furnished valuable and clear testimony. Specifically, Kho responded in a precise and straightforward manner, gave succinct responses where appropriate, and delivered gainful insight on liquor licensing in California, which offered the Court much-needed clarity on the subject.

Second, Torices was unable to explain how he had determined that the Restaurant[22] possessed $3,500 cash on hand, as he had stated on an inventory of assets created for the purpose of obtaining total loss insurance. The relevant line of questioning is as follows:

> **Question (by Uzeta's counsel):** Okay. Let me direct your attention, please–and this is in your binder in front of you, Exhibit No. 19, please. One second. That is–let me see if that's correct. Yes, No. 19, please. TOR0002, please.
> **Answer (by Torices):** Okay.
> **Question (by Uzeta's counsel):** So if we go down to–from the bottom going up, nine or ten lines, it says, "Cash on hand, $3,500." Do you see that?
> **Answer (by Torices):** Yes.
> **Question (by Uzeta's counsel):** You never saw $3,500 in a cash register, did you?
> **Answer (by Torices):** I never fully counted the $3,500.

Torices did not successfully explain how he arrived at the figure referenced above, or why he stated an arbitrary amount in the first place. As consequence, Torices' admission not only casts an unfavorable light on the accuracy of the insurance inventory, but also shows that Torices did not always to recall information accurately.

---

[19] Kho is a liquor license consultant who personally worked with the parties on the liquor license transfer that was never consummated. The relevance of Kho's testimony to the instant issues will be further discussed in Section V.
[20] Tr. Apr. 8 at 118:17–119:1 (Torices' testimony was stricken from the record as hearsay, but it is referenced here for the purpose of determining his credibility).
[21] Uzeta's counsel likely misspoke here as Torices had previously testified that it was Uzeta, not him, who had asked Kho to shred all paperwork. *See id.*
[22] Terms not previously defined have the meaning set forth in subsequent sections.

Last, Torices alleged that it was Uzeta who first proposed a business venture to him and Martinez.[23] Uzeta directly contradicted Torices, claiming that it was he who had approached her with the idea of starting up a business venture. However, based upon the Court's review of the written evidence, it is Torices, not Uzeta, who distorted this fact as stated on a text message he sent to Uzeta on or about November 6, 2016, which reads as follows:

> Roxanne & I are also interested in talking to you about the possibility of partnering up with the Redwood [Uzeta's restaurant] if you are interested.

Exhibit SS (admitted at Tr. June 25 at 140:20).

Neither Torices nor Martinez were ever able to present any compelling evidence that clarified Torices' text message or supported their contention that it was Uzeta who catalyzed the business relationship. Based on this inaccurate representation of events leading up to the inception of the parties' business venture, the Court views Torices' characterization of the evidence with pause. In sum, because Torices offered inconsistent testimony, overstated facts, and mischaracterized evidence, the Court determines that the rest of his testimony possesses limited probative value.

To the extent that Martinez's testimony did not suffer from the same deficiencies as Torices', the Court regards her testimony as generally credible. However, the Court notes that portions of Martinez's testimony relied on unsupported speculation. For example, Martinez testified that Uzeta readily accepted her role as Redwood's secretary at the outset of the business relationship. When probed further, however, Martinez conceded that she never personally spoke with Uzeta on the subject but had assumed that Uzeta found the role suitable.[24] In reaching the findings of fact discussed below, the Court considers Martinez's testimony only to the extent it arose from personal knowledge.

## V. Findings of Fact

Most of the underlying facts are disputed. The facts not in dispute consist of the following. Uzeta owned and operated a restaurant known as The Redwood Bar & Grill ("the Restaurant"), located in Covina, California.[25] On December 7, 2016, Torices and Martinez executed two bills of sale to purchase into the Restaurant operated by Uzeta.[26] The parties' transaction contemplated the formation of a new entity, Redwood Restaurant Group ("Redwood").[27] To facilitate Torices' and Martinez's investment, Redwood filed its articles of incorporation with the California Secretary of State on December 21, 2016.[28] Redwood was formed using Martinez's personal Legal Zoom account.[29] On December 26, 2016, Redwood filed a Statement of

---

[23] Tr. Apr. 8 at 55:23–56:8 (Torices' testimony regarding the parties' initial discussion of corporate roles at Redwood).
[24] Tr. June 25 at 19:1–8, 22:16–23:2 (Martinez's testimony); *see also id.* at 29:18–25 (the Court sustained Uzeta's hearsay objection regarding what Martinez said she heard Kho say to Uzeta).
[25] Defendant's Post Trial Brief at 2.; *see id.* at 142:13–14 (Uzeta's testimony regarding her initial purchase of the Restaurant).
[26] Joint Pretrial Stipulation (the "Pretrial Stipulation") at 2, Section I, ¶ 1.
[27] *See id.* at ¶ 2.
[28] *Id.*
[29] Tr. June 25 at 64:14–15 (Martinez's testimony, which the Court admitted after overruling an evidentiary objection).

Information, designating the type of business to be "Food and Beverage (Service)."[30]  On December 27, 2016, 49.99% of Redwood's shares were transferred to Martinez and Torices, and 50.01% of Redwood's shares were transferred to Uzeta.[31]

Most other details of the business relationship are disputed to differing degrees.  As described in greater detail below, the business relationship proved troubled from the outset.  The parties' differing understandings of their respective obligations to Redwood led to multiple disputes.

Plaintiffs' theory is that Uzeta resented Plaintiffs as a result of various disagreements over the operation of Redwood, and that this resentment motivated Uzeta to retaliate against Plaintiffs by taking various actions to deliberately damage Redwood. Plaintiffs state that these actions included (1) cancelling the transfer of a liquor license to Redwood, (2) unilaterally filing documentation with the California Secretary of State dissolving Redwood, and (3) allowing various items of allegedly valuable restaurant equipment that were maintained in a storage facility to be forfeited by failing to remain current on storage fees.  These actions, Plaintiffs assert, amounted to willful and malicious injury to their interest in Redwood.

There is no merit to Plaintiffs' theory.  Uzeta did not deliberately destroy Redwood or its assets out of spite.  Redwood failed because it did not generate sufficient revenue to pay its bills.

Testimony regarding the various disputes between the parties is set forth below.  The testimony shows that the parties had difficulty communicating and failed to clearly set expectations regarding each other's roles in the business.  It is not necessary for the Court to make findings with respect to many of the disputes between Plaintiffs and Uzeta.  Even if the Court accepted Plaintiffs' version of events, at most, Plaintiffs have shown that Uzeta breached an oral contract.[32]  Plaintiffs have fallen far short of showing that Uzeta committed willful and malicious injury to Plaintiffs' property interest in Redwood.

Based on the witness testimony proffered at trial, and all other evidence admitted into the record, the Court makes the following findings of fact.

## A. Redwood's Formation and the Parties' Business Relationship

On or about November 6, 2016, Torices sent Uzeta a text message about the prospect of "partnering up with the [Restaurant]."[33]  Uzeta construed this text message to be a proposal from Torices and Martinez to purchase an ownership interest in the Restaurant.[34]  In the absence of other credible evidence indicating otherwise, the Court finds that Torices initiated discussion to form a joint business venture with Uzeta.  At the time Torices approached Uzeta with the idea, and before Redwood was formed, Uzeta was negotiating the potential sale of the Restaurant to an unrelated buyer (the "Third-Party Deal").[35]  Uzeta informed Torices about the Third-Party

---

[30] Pretrial Stipulation at 2, Section I, ¶ 3.
[31] *Id.* at ¶ 4.
[32] To be clear, the Court makes no findings regarding whether Uzeta breached an oral contract, as such a finding is not necessary to dispose of Plaintiffs' § 523(a)(6) claim.
[33] Tr. June 25 at 138:8–139:21 (Uzeta's testimony); Ex. SS (admitted into the record at Tr. June 25 at 140:22).
[34] Tr. June 25 at 139:20–21 (Uzeta's testimony).
[35] *Id.* at 139:22–140:8.

Deal.[36] For various reasons, including the inability to finalize negotiations, Uzeta decided to cancel the Third-Party Deal on or about December 19, 2016.[37]

Sometime in late November 2016, Martinez and Torices began discussing the logistics of the business venture, which included the formation of Redwood.[38] At some point between late November 2016 and December 21, 2016 (the filing date of Redwood's articles of incorporation), the parties entered into an oral agreement to incorporate Redwood and formalize their business venture.[39] A written agreement memorializing the essential terms of the business venture was never prepared. Prior to Redwood's incorporation, the only formal documents defining the parties' business relationship consisted of the three bills of sale, dated December 7, 2016.[40]

Over the course of their business relationship with Uzeta, Torices and Martinez paid approximately $18,900 to support Redwood.[41] The Plaintiffs dispute characterization of monies given to Uzeta to fund various aspects of the business venture, which they itemized as follows[42]:

1) $5,000—for the purchases of 2,500 shares of Redwood by Torices and 2,499 shares of Redwood by Martinez;
2) $10,000—loan by Torices and Martinez to pay down Uzeta's indebtedness to the State Board of Equalization, which gave rise to a lien against the liquor license;
3) $3,900—loan by Torices and Martinez to Uzeta to enable her to pay rent for the space leased for the Restaurant.

Uzeta's position is that Torices and Martinez originally agreed to purchase a 49.99% interest in Redwood for $20,000.[43] At trial, Uzeta could not explain why she failed to object to the bills of sale presented to her on December 7, 2016, and instead claims that she viewed a $5,000 check dated November 28, 2016 as down payment on the $20,000 buy-in amount.[44] Uzeta disputed that Torices and Martinez acquired their interest in Redwood for only $4,999 (or $1 per share).[45]

---

[36] *Id.*; *see also* Ex. SS.
[37] Tr. June 25 at 123:23–124:18 (Uzeta's testimony); Ex. NN (admitted into the record at Tr. June 25 at 124:18).
[38] *Id.* at 17:21–18:5 (Martinez's testimony).
[39] Tr. April 10 at 84:17–85:3 (Torices' testimony).
[40] Months after the inception of the business venture, the Plaintiffs prepared and delivered an unsigned and undated letter of intent to Uzeta at her request on or about June 23, 2017. *See* Tr. Apr. 8 at 64:4–65:15 (Torices' testimony concerning the circumstances under which the letter of intent was drafted); Ex. 11 (admitted by stipulation). The fact remains that the parties did not prepare a formal written agreement at the outset, which further explains their various disagreements.
[41] Tr. June 25 at 84:16–85:16 (Martinez's testimony); *Id.* at 160:18–19 (Uzeta's testimony); *see* Exs. 8, 26 (admitted by stipulation).
[42] Tr. June 25 at 84:16–24 (Martinez's testimony); Tr. Apr. 8 at 53:21–54:15, 116:4–117:6 (Torices' testimony). There was no evidence furnished to support a payment of $948 to Legal Zoom from either Torices or Martinez, nor was this payment ever explicitly discussed at trial.
[43] Tr. June 25 at 105:3–8
[44] *Id.* at 107:5–11 (Uzeta's testimony); Ex. 8 (admitted by stipulation).
[45] Tr. June 25 at 105:3–17; *see also* Ex. 44, ¶ 3 [Declaration of Christina Uzeta in Support of Supplemental Opposition to Emergency Motion Regarding the Sufficiency of Defendant's Responses to Plaintiff Basilio Torices's First Request for Admissions] (the Court takes judicial notice of this document [Adv. Doc. No. 49] as it forms part of the existing docket of this adversary proceeding).

Uzeta further understood that the agreement between the parties contemplated that Torices and Martinez would work at the Restaurant, i.e., put in "sweat equity" in exchange for their shares.[46] According to Uzeta, neither Torices nor Martinez fulfilled that obligation.[47] Uzeta further believed that Martinez and Torices had the obligation to maintain the Restaurant's bar restocked, and supply capital to pay rent and finance the Restaurant's physical restoration.[48] Torices conceded that he did not understand that Uzeta would not consummate the business agreement until after these promises were fulfilled, i.e., obligations regarding "inventory, sweat equity, and remodel."[49] Torices instead contended that he and Martinez provided many hours of labor at the Restaurant,[50] but that they were not required to fulfill any of these conditions until after Uzeta had transferred the Liquor License to Redwood:

> **Question (by Torices' counsel):** Going back to Paragraph 1 of this document, there's some kind of conditions. Would you mind reading that?
> **Answer (by Torices):** Yes. As –
> **Question (by Torices' counsel):** It starts off with, As requested.
> **Answer (by Torices):** Yes, below is our outline of intent for the Redwood Bar & Grill, herein known as the establishment. Upon completion of the transfer of the ABC license, Number 552801, Redwood Restaurant Group, Inc., herein known as the company.
> **Question (by Torices' counsel):** Okay. So what is it you're – what is your understanding as to when the sequence of events had to occur?
> **Answer (by Torices):** Well, everything – we were waiting for the actual transfer of the license to start everything. We didn't want to put any more money than I had already had, cash out of pocket and sweat equity, which I had already started, and we did many events at the bar. I actually volunteered to cook in a couple of events, just to keep the bar running and the doors open until we can transfer the license. I know that was actually sweat equity, but this -- we weren't supposed to do any of this until after the license was transferred to the actual Redwood Restaurant Group and open for business the next day.

Tr. Apr. 8 at 69:5–24.

Based on disagreements concerning the characterization of each parties' contractual obligations, monies paid in consideration of Redwood's shares, and other substantive aspects of Redwood's operations, the Court finds that the parties shared a fundamental misunderstanding of their business relationship, and of the many obligations presumed therein. The parties' failure to prepare a written agreement memorializing the business venture from the outset further substantiates the Court's finding.

---

[46] Tr. June 25 at 153:12–18 (Uzeta's testimony).
[47] *Id.*
[48] *See* Ex. 11A (containing an e-mail from Uzeta to her brother, Christopher Uzeta, and carbon-copying Torices and Martinez).
[49] Tr. Apr. 10 at 96:9–22 (Torices' testimony).
[50] Tr. Apr. 8 at 69:15–70:20 (Torices' testimony).

**B. Transfer of the Liquor License**

One focal point of the parties' dispute surrounds the transfer of a Type 47 Liquor License, No. 552801 (the "Liquor License"). In 2014, Uzeta purchased the Liquor License from a third-party, who had obtained it through a state lottery.[51] Uzeta testified that she acquired the Restaurant and the Liquor License for $50,000.[52] Notwithstanding the ill-defined business agreement, the parties minimally understood that their intended business venture required Uzeta to transfer the Liquor License to Redwood.[53] Pursuant to this understanding, the parties approached LiquorLicense.com, and on June 23, 2017(the "June 23 Meeting"), Uzeta executed a series of documents collectively characterized as a notice of intended transfer of the Liquor License (the "Notice of Intended Transfer").[54]

Kho, who worked as a liquor license consultant for LiquorLicense.com as of June 23, 2017, assisted the parties in the process and prepared the Notice of Intended Transfer.[55] The contemplated price of the transfer was $3,750.[56] However, an escrow account was never opened as the parties failed to deposit any money as part of the transfer.[57] Torices and Martinez assert that the Liquor License was worth $80,000 as of July 6, 2017, the date upon which Uzeta allegedly pulled the Liquor License out of escrow. Their theory is that Uzeta suspended escrow after Kho told her that the Liquor License could be sold for $80,000. Uzeta denied that this exchange ever occurred, and Kho does not recall it.[58]

In addition, Kho credibly explained the implications arising from the Liquor License's initial purchase through a state lottery:

> **Question (by Uzeta's counsel):** And do you recall that this was a liquor license that was purchased through a California state lottery?
> **Answer (by Kho):** Correct.
> **Question (by Uzeta's counsel):** And are you familiar with that process?
> **Answer (by Kho):** Yes.
> **Question (by Uzeta's counsel):** And so can you explain to the Court what is the process of when somebody buys a liquor license through the state lottery and whether or not there are any restrictions on reselling that, please?
> **Answer (by Kho):** Sure. The license was, one, being an inter-county transfer which is through a lottery system. That means you can procure a license from a different county and move it into Los Angeles, in this particular case. The stipulations with the ABC is when you win an inter-county license, you cannot sell it for the first two years, period. So years 1 and 2, it cannot be transferred to a different corporation, sold, moved to a different premise, anything of that nature. Years 3, 4, and 5, the license can only be sold for a maximum value of $13,800.

---

[51] Tr. June 25 at 142:15–22, 145:16–19 (acknowledging the specific type of liquor license) (Uzeta's testimony).
[52] *Id.* at 142:24–25. The record is silent as to the amount of the purchase price that was allocated to the Liquor License.
[53] *Id.* at 160:1–9 (Uzeta's testimony); Tr. Apr. 8 at 64:4–20 (Torices' testimony).
[54] *See* Ex. 13 (admitted by stipulation).
[55] Tr. June 25 at 197:19–25, 210:4–17 (Kho's testimony).
[56] *See* Ex. 13; *Id.* at 198:1–3.
[57] Tr. June 25 at 199:17–20 (Kho's testimony).
[58] *Id.* at 146:7–12 (Uzeta's testimony); 207:17–208:4 (Kho's testimony).

> **Question (by Uzeta's counsel):** Okay.
> **Answer (by Kho):** After year 5, the license is fully mature and can be sold at its market value.

Tr. June 25 at 198:4–25.

Accordingly, the Liquor License had not yet matured as of the June 23 Meeting, and on that day, the Liquor License could not have been sold for more than $13,800.[59] The Liquor License would not realize its full market value until 2018.[60]

 Based on the foregoing, the Court finds that Uzeta did not suspend the escrow transaction because she thought she could sell the Liquor License to someone else at a higher price. Instead, the failed escrow transaction can be explained by the collapse of the parties' relationship, and specifically with Uzeta's growing frustration with Martinez and Torices. For instance, Torices acknowledged that approximately one week after the June 23 Meeting, he received a text message from Uzeta requesting $5,000 to pay the Restaurant's rent.[61] Torices perceived Uzeta's request for more money as extortion.[62] Leading up to the June 23 Meeting, Torices further recalled that Uzeta stated that she would not proceed with escrow unless Torices and Martinez signed "a separate contract."[63] He also testified that at the June 23 Meeting, Uzeta was still upset because she had not been assigned the title of Redwood's president.[64] These discrete episodes suggest that the Liquor License transfer failed due to significant tension in the parties' already-fraught personal and professional relationship.

### C. Deterioration of the Parties' Relationship

 Another key cause that irreparably damaged the parties' relationship was the designation of Torices as Redwood's president in the company's articles of incorporation.[65] Uzeta testified that at the outset of their business relationship, the parties agreed that Uzeta would be Redwood's president as she already oversaw restaurant operations and the Restaurant's lease was in her name.[66] Directly contradicting Uzeta, Torices testified that Uzeta actually embraced the role of secretary:

> **Question (by Torices' counsel):** And how did you come about those titles?
> **Answer (by Torices):** … I would be president because of my credit and
> everything that I could do, and Christina said that she would perfect as an officer, as a secretary because then all she had to do was the minimal and be at our meetings, that we had to have a monthly meeting to take notes and then any other, you know, questions or concerns that we had during our actual meetings.

*See* Tr. Apr. 8 at 55:23–60:12.

---

[59] *Id.* at 199:1–8 (Kho's testimony).
[60] *Id.* at 143:10–16 (Uzeta's testimony).
[61] Tr. Apr. 8 at 115:8 – 11 (Torices' testimony).
[62] *Id.*
[63] *Id.* at 123:10 – 16.
[64] *Id.* at 124:4–8; *see also* Ex. 11A (admitted by stipulation).
[65] *See* Ex. 10 (admitted by stipulation).
[66] Tr. June 25 at 115:11–23 (Uzeta's testimony).

Ultimately, Torices, rather than Uzeta, was designated as Redwood's president because doing so would allow Redwood to obtain financing on more favorable terms.[67] Given that the record is replete with diverging testimony on this subject, it is unclear whether the parties understood their assigned roles at the outset of the business relationship. However, it is certain that Uzeta communicated her disaffection to Torices early on in the business venture:

> **Question (by Uzeta's counsel):** Can you explain why you texted that and what it means, please?
> **Answer (by Uzeta):** January 10th was when I discovered what my title – that my title was secretary. And Bosi, this is Bosi -- I'm sorry, Basilio explaining to me why I was named secretary. And my response to his explanation was, "I want it fixed."
> **Question (by Uzeta's counsel):** So on January 10th, 2017, you were indicating that you did not want to be secretary, correct?
> **Answer (by Uzeta):** Correct.

Tr. June 25 at 115:2–10 (Uzeta's testimony).

With respect to this issue, the Court can only determine that the designation of roles was not properly communicated between the parties. Whether Uzeta failed to read her designation on the articles of incorporation, or did not grasp the document's importance, it is only evident that she raised the issue as early as January 10, 2017. Based on its review of the record, the Court cannot find that either Torices or Martinez sought to deceive or insult Uzeta by naming her secretary, nor does the Court determine that Uzeta welcomed the role of secretary at any point. Instead, the evidence indicates that each side had differing expectations regarding their assigned roles, and their inability to effectively address the issue, augmented the parties' mutual distrust and irreparably deteriorated the relationship.

A third source of hostility stems from Uzeta's perceived lack of access to the Legal Zoom account used to form Redwood. Uzeta maintained that Torices and Martinez refused to allow her to review Redwood's formation documents until May 2017, long after the corporation had been incorporated.[68] Torices and Martinez asserted that Uzeta was permitted to access the formation documents.[69] As with the issue concerning corporate roles, the Court concludes that the parties' discord grew out of their inability to establish effective channels of communication.

**D. The Failure of the Business Venture and Redwood's Dissolution**

The record clearly demonstrates that Uzeta's business was experiencing significant financial turmoil even before Redwood was formed, and which persisted throughout the parties' venture. Both Torices and Martinez were knowledgeable of the restaurant industry and had prior work experience overseeing business operations in restaurants. Notably, having worked at the Restaurant in 2014 and then again in August of 2016, Martinez was familiar with its operations

---

[67] *See* Ex. 11A (admitted by stipulation).
[68] Tr. June 25 at 137:8–22 (Uzeta's testimony).
[69] *Id.* at 81:19–82:7 (Martinez's testimony); Tr. Apr. 10 at 94:4–13 (Torices' testimony).

and even had a supervisory role there.[70] Additionally, Torices knew of the subpar state of Uzeta's personal finances:

> **Question (by Torices' counsel):** And how did you come about those titles?
> **Answer (by Torices):** … And because of her–also her [Uzeta's] financial standings, she didn't have any credit, she had a lot of debt, and my credit was actually, you know, it was over 850 on my credit score, so I had a really good credit score. So we talked about what the bar needed, we talked about all the renovations that we would need after we started as the Redwood Restaurant Group, after the opening day. So we talked about getting out a loan to get all these things done.

*See* Tr. Apr. 8 at 56:19–57:1.

Torices also possessed an unfettered view of the Restaurant's operations and perceived Uzeta's business as being poorly managed:

> **Answer (by Torices):** So it was crucial for the restaurant–the Redwood Restaurant Group to work, to actually have enough stock in the bar to make money, open up and sell beer. I didn't want to run a business the way she was running it. It was just ran very poorly throughout, so that was one of the things that I saw as a potential to go in and actually change the bar around. And so that's why I suggested we did a corporation so it would have structure, because the bar did not–it did not run–have any structure at all, even the way the people worked, their schedules, the way the money was handled out of the register at the bar, that wasn't handled properly, where it was kept in the office wasn't handled properly.

*See id.* at 57:21–58:7.

Based on the foregoing, at the time they approached Uzeta, Martinez and Torices were aware, or should have been aware, that Uzeta's business was struggling.

    The Restaurant's profitability did not improve after the inception of the parties' business venture but continued its incremental decline.  The parties were unable to fulfill a series of optimistic targets to support the Restaurant's revival, including maintaining the Restaurant's bar adequately stocked and initiating an extensive renovation plan.[71]  The Restaurant was also not generating enough revenue to permit the parties to pay for essential outlays, and as of July or August of 2017, the parties were more than two months behind on rent for the Restaurant.[72]  Given the Restaurant's financial difficulties, Uzeta proposed to sell the business on more than one occasion.[73]  Uzeta testified that Torices rejected her proposal each time.[74]

---

[70] *See* Tr. June 25 at 25:22–26:24 (Martinez's testimony).
[71] *See* Ex. 11A.
[72] Tr. June 25 at 126:13–16, 141:3–15 (Uzeta's testimony).
[73] *Id.* at 140:22–141:15.
[74] *Id.*

On August 14, 2017, Uzeta filed a *Certificate of Election to Wind Up and Dissolve* (the "Certificate of Election") on Redwood's behalf with the California Secretary of State.[75] The parties did not hold any formal meetings on Uzeta's decision to dissolve Redwood.[76] The Certificate of Election stated that an election to dissolve Redwood had been made by a vote representing over 50% of Redwood's voting power.[77] Redwood's incorporation documents are silent on the issue of dissolution, and its corporate bylaws, if any, were not introduced into the record.

On June 14, 2017, Uzeta executed an amendment to the Restaurant's lease, which designated Redwood as the new tenant on the lease and named Uzeta as guarantor.[78] Following Uzeta's default on the Restaurant's lease, a notice to pay rent or quit was served on her on October 13, 2017.[79] The Restaurant closed shortly after.

### E. The Restaurant Equipment

In addition to the Liquor License, Torices and Martinez contended that the Restaurant had a miscellany of various assets, including televisions, kitchen equipment, pool tables, bar stools, and booths, collectively worth $160,000 (the "Restaurant Equipment").[80] Torices and Martinez assert that Uzeta willfully and maliciously injured their property interest in the Restaurant Equipment, by failing to remain current on the storage fees for the unit where the equipment was stored, thereby deliberately allowing the equipment to be lost to forfeiture. There is no merit to Torices and Martinez's argument. The Court finds that the Restaurant Equipment had *de minimis* value.

First, much of the Restaurant Equipment which Torices and Martinez contend was valuable did not belong to them. The following items of equipment were either fixtures belonging to the landlord of the Restaurant's premises or were leased from a third party[81]:

1) One kegerator;
2) One glass front fridge;
3) One three-compartment sink;
4) Two speed wells;
5) One L-shaped main bar;
6) One stainless steel back bar;
7) One beverage dispenser;
8) One walk-in-cooler;
9) One upright two-door freezer;

---

[75] *See* Ex. 17A (admitted by stipulation).
[76] Tr. June 25 at 173:14–25 (Uzeta's testimony).
[77] *See* Ex. 17A (admitted by stipulation).
[78] *See* Ex. 12 (admitted by stipulation).
[79] *See* Ex. 28 (admitted by stipulation).
[80] Complaint to Determine the Dischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6) [Adv. Doc. No. 1] at ¶¶ 28, 65.
[81] For the sake of brevity, the Court omits specific reference to the trial record, but its findings are generally based on the testimony of Uzeta and her brother, Christopher Uzeta, who principally oversaw the maintenance and repair of these items. In sum, the Court finds the testimony of these two individuals highly probative on the subject. *See generally*, Tr. June 25 at 219:14–226:1 (Christopher Uzeta's testimony).

    10) One upright fridge;
    11) One ice machine
    12) Two sinks;
    13) One range;
    14) One grill;
    15) One deep fryer;
    16) One griddle;
    17) One range;
    18) One grill;
    19) Two professional kitchen hoods;
    20) One fire-arrest system;
    21) Electrical wiring and lights;
    22) Front doors;
    23) Computer systems; and
    24) Six professional speakers.

Restaurant Equipment that was not leased or was not a fixture was retained by Uzeta in a U-Haul storage unit after closure of the Restaurant.[82] Uzeta testified that she was unable to afford storage payments and any remaining Restaurant Equipment was sold by U-Haul in a lien sale on or about March of 2018.[83] Having lost all contact with Torices and Martinez by that point, Uzeta did not notify them about the stored Restaurant Equipment or the lien sale.[84] The Court finds Uzeta's testimony highly probative on this subject.

    Uzeta credibly testified that the Restaurant Equipment maintained at the U-Haul storage unit had little value because it was used or did not work.[85] Plaintiffs failed to rebut Uzeta's testimony. In support of their contention that the Restaurant Equipment was worth $160,000, Plaintiffs submitted an inventory of the equipment compiled by Torices in January 2017 for the purpose of obtaining fire and casualty insurance. Torices' inventory valued the Restaurant Equipment as follows:

| Item | Plaintiffs' Valuation |
|---|---|
| Televisions | $7,000 for nine televisions |
| Booths | $10,500 for eight booths |
| High tables and stools | $3,000 for ten high tables and 40 stools |
| Bar stools | $1,800 for twelve bar stools |
| Lighting system | $2,700 |
| Two pool tables and accessories | $7,000 |
| One shuffleboard table | $1,500 |
| Canned goods inventory | $900 |
| Refrigerated food inventory | $450 |
| Glassware and plates | $2,500 |

---

[82] Tr. June 25 at 108:6–19 (Uzeta's testimony).
[83] *Id.*; Ex. 41 (admitted by stipulation).
[84] Tr. June 25 at 147:12–20 (Uzeta's testimony).
[85] *Id.* at 158:24–159:8.

| Utensils and gadgets | $700 |
|---|---|
| Liquor and beer | $8,000 |
| Cash on hand | $3,500 |
| Surveillance system | $4,000 |
| Seven low tables and ten chairs | $1,300 |
| Microwave oven | $800 |
| "Food sliver" [sic]—possibly "food slicer." | $1,300 |
| Outside sign | $4,000 |

*See* Ex. 19 (excluded as irrelevant at Tr. Apr. 10 22:22–23:5 but referenced here to illustrate the contentions made by Torices and Martinez).

Torices' inventory is not admissible.[86] Torices lacks the qualifications to opine as to the value of used restaurant equipment. Further, Torices had an incentive to inflate the valuation, since his objective was to obtain insurance "for the maximum liability in case of a total loss like a fire."[87] In addition, Torices could not personally establish which items were abandoned at the Restaurant.[88]

On or about January 2017, Torices entered into two 36-month leases with Ladco Financial Group, on behalf of Redwood, under which it leased equipment to process sales and payments (the "Sales Equipment").[89] The parties offered contradicting testimony regarding the status of the Sales Equipment. Uzeta claimed that Torices removed the Sales Equipment from the Restaurant, while Torices and Martinez contended it was left there.[90]

With respect to the disposition of the Sales Equipment, Uzeta's testimony is more credible. Uzeta had no reason to retain the Sales Equipment at the restaurant. Prior to entering into business with Torices and Martinez, Uzeta had leased a point-of-sale system from Wells Fargo. Torices and Martinez failed to establish, by a preponderance of the evidence, that Uzeta misappropriated the Sales Equipment.[91]

All other issues of fact raised by the parties but not specifically discussed above are not relevant to Plaintiffs' § 523(a)(6) claim. Accordingly, the Court does not make any findings with respect to these issues of fact.

## VI. Conclusions of Law

"Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and "malicious'

---

[86] *See also* Tr. Apr. 10 at 22:22–23:5 (ruling that Torices' inventory valuation is not admissible).
[87] *Id.* at 178:24–25 (testimony of Torices).
[88] *Id.* at 190:20–192:5 (Torices' testimony).
[89] *Id.* at 141:14–25, 214:4–217:6.
[90] Tr. June 25 at 247:6–248:3 (the Court inquired about the unresolved status of the Sales Equipment. The parties restated their previous positions but failed to furnish additional information on the subject).
[91] *Grogan v. Garner*, 498 U.S. 279, 287 (1991) ("Because it seems clear that a preponderance of the evidence is sufficient to establish the nondischargeability of some of the types of claims covered by Section 523(a), it is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions.")

requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). When determining intent, there is a presumption that the debtor knows the natural consequences of his actions. *Ormsby v. First Am. Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted). "Within the plain meaning of this definition, it is the wrongful act that must be committed intentionally rather than the injury itself." *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005).

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under §523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008). "[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id.* at 1041.

Torices and Martinez asserted that Uzeta performed various actions to willfully and maliciously injure them, both in retaliation for the perceived slight of not being named Redwood's president, and because she was allegedly motivated to dissolve Redwood upon learning that the Liquor License was worth substantially more. The trial testimony provided by Torices and Martinez focuses on the following alleged retaliatory acts:

1) Refusing to transfer the Liquor License to Redwood, in contravention of the parties' agreement;
2) Dissolving Redwood by filing a Certificate of Dissolution with the Secretary of State, which incorrectly stated that Redwood had no assets or liabilities;
3) Defaulting on the Restaurant's lease; and
4) Storing some of the Restaurant Equipment in U-Haul storage units, and then allowing that equipment to be lost to foreclosure by failing to pay storage fees.

None of Uzeta's conduct qualifies as either "willful" or "malicious" within the meaning of § 523(a)(6). Many of Uzeta's actions arose not from a corrupt intent, but from a desire to preserve her business and financial status, or in pursuit of her own understanding of the business agreement. In fact, the source of the parties' acrimonious relationship can be traced back to differing views on their ill-defined business venture. From the outset, the parties failed to clearly establish the fundamental terms of their business venture. First, the parties had contradictory ideas of the amount required to buy into the business. Torices and Martinez asserted that the 4,999 Redwood shares they purchased were merely worth $5,000, while Uzeta construed the $5,000 sum as a down payment for consideration totaling $20,000. Second, the parties' understanding of additional conditions imposed on Torices and Martinez also diverged. These obligations consisted of keeping the bar adequately stocked, providing "sweat equity," and funding the Restaurant's renovation. Accordingly, Uzeta expected Plaintiffs to fulfill these

promises after executing the bills of sale on December 7, 2016, while Torices and Martinez believed these additional conditions were contingent on the completion of the Liquor License transfer. The Court finds material that Torices admittedly did not understand Uzeta's version of the agreement. As consequence, Uzeta's decision to cancel the Liquor License transfer stems from a mutual misunderstanding over these promises, and not from a personal vendetta against Torices and Martinez.

Torices and Martinez make much of the fact that Uzeta unilaterally dissolved Redwood. However, Uzeta's decision to file the Certificate of Dissolution was not wrongful as Redwood's corporate documents do not prescribe a formal procedure to wind down the corporation. Moreover, any false or inaccurate statements that Uzeta may have supplied on the Certificate of Dissolution are not material. Additionally, the claim that Uzeta purposefully allowed the Restaurant Equipment to be foreclosed upon is simply absurd. Uzeta owned many, if not all, of the items removed from the Restaurant. She, and not Torices or Martinez, incurred the time and money to ensure that these items were properly stored. Having undertaken the expense and trouble of storing the items, it is not plausible that Uzeta allowed the items to be lost to foreclosure merely to spite Torices and Martinez. On the contrary, Uzeta's previous conduct indicates that she is significantly more mindful of her property. For example, she twice rejected Torices' plans to make unnecessary or costly capital expenditures, with respect to the Sales Equipment lease from Ladco and the installation of a new beer tap system.[92] Uzeta's prior decisions are inconsistent with an individual who would willingly squander her personal property on a whim. Although Uzeta's failure to contact Torices or Martinez about the imminent lien sale is perhaps inconsiderate, it is entirely understandable in light of the parties' deteriorated relationship and inability to communicate fruitfully on prior occasions.

A more reasonable explanation is that Uzeta's financial means were so devastated by her failed business venture that she became incapable of making storage payments. This explanation is further supported by her inability to tender timely rent payments on the Restaurant's lease, and by her eventual bankruptcy filing. In fact, the decline and downfall of Uzeta's business was not a surprising development. Uzeta's restaurant business was struggling before Redwood's formation and throughout the parties' business venture, and it ultimately collapsed shortly after the parties ceased to communicate. Based on their testimony, Torices and Martinez either knew or should have known that Uzeta's business was financially troubled and failing to generate an adequate stream of revenue.

It was also Torices who approached Uzeta about forming a business venture, in part because he thought he was capable of rescuing Uzeta's struggling business. As a self-avowed business manager, Torices should have understood that turning around the Restaurant's fortunes would require a substantial influx of cash. The claim that Uzeta was attempting to extort money from Torices and Martinez is not believable when it is clear that the business's success depended on significant financial contributions. It is equally far-fetched that Uzeta sought to prejudice the parties' joint business venture, when she was personally liable for the Restaurant's lease and had a majority stake in Redwood. By and large, Uzeta's stated desire to ensure the Restaurant's

---

[92] *See* Ex. 11A (Uzeta's email reads in relevant part: "A new beer tap system is not a financially sound change at this time, and would not be in the best interest of the business immediately upon close of escrow as it would increase the need for Inventory in excess of $1400 per week.").

profitability seems more plausible.  In sum, Uzeta did not commit the above-referenced actions for the purpose of injuring Torices or Martinez; her actions are the "natural consequences" of a failed business relationship, one which was vaguely defined, improperly capitalized, and consisted of individuals with incompatible management styles.[93]

## VII. Conclusion

Based upon the foregoing, Uzeta is not indebted to Torices and Martinez under § 523(a)(6).  The Court will enter judgment consistent with this Memorandum of Decision.

###

Date: December 19, 2019

Ernest M. Robles
United States Bankruptcy Judge

---

[93] Based on the foregoing, none of Uzeta's actions can be reasonably construed as tortious under state law.  The Court reiterates that even if it were to accept Plaintiffs' version of events, the most that Plaintiffs have shown is breach of an oral contract.